DAVID ELLIOTT and Others, Infants, by Their Guardian, HARRISON S. ELLIOTT, and Others, Plaintiffs, *v.* TEACHERS COLLEGE and JOHN J. BENNETT, JR., as Attorney-General of the State of New York, Defendants.

Supreme Court, Trial Term, New York County, December 15, 1941.

*Spence, Windels, Walser, Hotchkiss & Angell* [*Kenneth E. Walser* and *James H. Halpin* of counsel], for the plaintiffs.

*Emil Weitzner*, for the intervening plaintiffs.

*Milbank, Tweed & Hope* [*Timothy N. Pfeiffer* and *William H. Mathers* of counsel], and *John J. Bennett, Jr., Attorney-General* [*Howard F. R. Mulligan, Assistant Attorney-General*, of counsel], for the defendants.

WALTER, J. Teachers College is an educational corporation chartered in New York for the purpose, simply stated, of teaching teachers how to teach. As a means of enabling its students to learn to do by doing and observing, it long has maintained one or more schools for the elementary and secondary education of children. One of such schools is the Horace Mann School, which it took over as an existing school nearly fifty years ago. Another is the Lincoln School, which was established in 1917. In connection with the establishment of Lincoln School it received grants of property and money from General Education Board, a charitable corporation founded by John D. Rockefeller for the promotion of education. It now seeks to merge or unite the Horace Mann School and the Lincoln School, and plaintiffs seek an injunction and a declaratory judgment upon the ground that such merger or unification would be in violation of the terms of such grants.

The plaintiffs are pupils of the Lincoln School, parents of such pupils, an unincorporated association of teachers and parents, and an individual who contributed to a building fund for the school. The Attorney-General of the State of New York is joined as a defendant. He interposed an answer in which he prayed that the rights of the unknown beneficiaries of any charitable trust found to exist be established and declared, and that the obligations of any of the parties to the suit be determined and adjudged. A motion by Teachers College to dismiss the complaint on the ground that the plaintiffs lack legal capacity to bring the suit was heretofore denied, but the denial was predicated upon the fact that by his answer the Attorney-General in effect had joined the plaintiffs. (*Elliott* v. *Teachers College*, N. Y. L. J., June 12, 1941, p. 2643, per SHIENTAG, J.) The case consequently is to be considered as one in which the Attorney-General seeks to compel a devotion of property to the charitable purpose specified by an existing and competent donor. I also assume, but do not decide, that the original and intervening plaintiffs, other than the Attorney-General, are entitled to raise the questions which are here litigated.

In papers written in 1915 and 1916 President Charles W. Eliot, of Harvard University, and Dr. Abraham Flexner, of the General Education Board, expressed ideas concerning education which made a profound impression upon educators of the time. Those ideas cannot be completely stated in a sentence, but for present purposes it is sufficient to say their theme was that the programs then prevailing in elementary and secondary schools had become bogged down by classical tradition and there was need for changes in curricula and methods so as to make them more in accord with the interests and activities of modern conditions. What the

changes should be was not definitely formulated. Experimentation was recognized as essential. General Education Board was willing to contribute to the cost of such experimentation, and Teachers College was willing to carry on the experiments. They, therefore, united in establishing what they conceived as " a laboratory for the working out of an elementary and secondary curriculum which shall eliminate obsolete material and endeavor to work up in useable form material adapted to the needs of modern life," and they called it Lincoln School. That was in 1917.

After several years in leased premises, land was bought and buildings were erected, and General Education Board conveyed that land and those buildings to Teachers College. The conveyance was by absolute deed vesting a fee simple title. It was made, however, upon the understanding, later expressed in a formal agreement, that Teachers College agreed to hold and use such land and buildings " for the use and benefit and for the purposes of said Lincoln School of Teachers College during the existence of said school," and if the school ceased to exist, or in case of failure to use the property for the use and benefit thereof, to convey the property back to General Education Board or its successors or assigns " upon a written request by it or them so to do." That was in 1922.

In addition to thus supplying land and buildings, General Education Board annually supplied funds with which to meet the expenses of operation, or at least such part of such expenses as exceeded the income from tuition fees. That continued from 1917 to 1925.

Discussions were then had as to what was called " permanent financing," and the then dean of Teachers College submitted to the board a statement respecting the school, dated April 30, 1925. He spoke of " guidance in ways and means of deciding what to teach " as " the one greatest need in education today," and said of the school, " No experiment station is so widely known in the educational world, and none is potentially so influential." He said that the trustees of Teachers College were prepared to accept funds which " will make it possible for them for some years to come to carry on the types of activity now characteristic of The Lincoln School." He concluded: " As far as we can now see, there will never be a time when work of this kind will not be important, but it would seem to us wise that the terms of any gift made for this purpose now should be sufficiently broad and elastic to permit the necessary adjustments to social and educational conditions as they change in the course of time." The then director of Lincoln School also submitted a statement, dated October 13,

1925. He asked for a grant of funds the income from which should be used by the trustees of Teachers College " to maintain the experimental school and the educational investigations associated with it." He also said: " It is understood that the purposes and endeavors of the School are to be continued in general as at present; but that as the past eight years have often shown it wise to change ways and personnel in the work, nothing in the documents regarding the proposed grant should be interpreted as restraining the institution after full consideration from changing plans and methods or from undertaking added types of educational experimentation or the investigations essential thereto, as in later years may seem wise to the trustees."

The General Education Board then granted to Teachers College $500,000 in 1926; $500,000 in 1927, and $2,000,000 in 1928. The instruments of grant quote the statement of October 13, 1925, above mentioned. They are expressed as grants to Teachers College for endowment, " the income to be used for the support of The Lincoln School of Teachers College in order to insure the permanence of experimental work in the field of elementary and secondary education, in general accord with the program and purposes set forth in a letter of Dean James E. Russell dated April 30, 1925, and the formal letter of application of October 13, 1925." The instruments of grant also contain the following:

" The Board understands that it is the intention of the College in requesting a contribution for endowment of The Lincoln School of Teachers College, as it is also the condition of the pledge, that the College will conduct The Lincoln School in general conformity with the present policy and with the spirit of the said letter of Dean Russell, dated April 30, 1925, and of the said letter of application dated October 13, 1925, but nothing herein contained shall be interpreted as restraining the college, after full consideration, from changing plans and methods or from undertaking added types of education experimentation or the investigations essential thereto, as in later years may seem wise to the Trustees."

The instruments of grant also expressly canceled the agreement respecting the use of the land and buildings which the Board previously had conveyed to Teachers College, and declared that such agreement " shall be of no further force or effect for any purpose whatsoever."

In accepting the grants the trustees of Teachers College agreed to " faithfully perform the covenants on behalf of said institution contained in the pledge."

In 1934 General Education Board, apparently without any request from Teachers College, adopted a " statement of policy "

apparently applicable to all the various appropriations of endowment funds made by the Board prior to April 14, 1932, the incomes of which were specified as to purpose. It was therein stated to be the desire of the Board that the gift " shall always be regarded as available for use in the broadest way so as best to promote the general purpose for which it is made." In specification of that general desire it was further stated that if, in the judgment of those then responsible for the use of the gift, the general purpose for which it was made can thereby be better served, the gift may be transferred to another institution, and, after ten years after the date of the gift, the income may be used in whole or in part for some specific purpose other than that for which the gift was originally made, " such specific purpose to be as closely akin to the original purpose as may be found practicable at the time." In 1937 General Education Board made another statement of policy which, among other things, reiterates its statement of 1934 with the exception that the phrase last quoted from the 1934 statement is made to read: " such specific purpose or purposes to be as reasonably related to the original specific purpose as may be found practicable at the time, having regard to intervening changing conditions."

On November 4, 1940, the trustees of Teachers College decided to combine the activities of the Horace Mann School and the Lincoln School into a single school, to be called the Horace Mann-Lincoln School of Teachers College, and to use therefor the available plants formerly occupied by the two schools. It is that determination which has given rise to this suit.

It is clear that all the grants here in question were made to Teachers College, and to it alone. The property granted unquestionably was thereby devoted to charitable purposes because it was granted to a corporation the charter purposes of which are charitable, but no trust, in the technical sense of that word, was created. (Restatement, 2 Trusts, p. 1093; *Sherman* v. *Richmond Hose Co.*, 230 N. Y. 462, 472; *St. Joseph's Hospital* v. *Bennett*, 281 id. 115, 119, 125.) Title is vested in Teachers College and in it alone. Nevertheless, the money grants with which we are here concerned were made for a purpose expressed therein, and, at least in the absence of consent by the donor that the money may be used for a different purpose, compliance with the purpose so expressed in the grants can be enforced. (*St. Joseph's Hospital* v. *Bennett, supra.*)

The first question to be considered, therefore, is whether or not what Teachers College proposes to do is a deviation from the purpose expressed in the grants, and that involves a determination of what purpose is therein expressed.

Plaintiffs argue that that purpose is the support and maintenance of Lincoln School, but when we inquire what Lincoln School is we are at once confronted with the fact that there is no entity of that name, nothing which owns property, employs teachers, receives tuition fees, or imparts instruction through its own agents. To the students who once did or now do attend classes in the building at No. 425 West One Hundred and Twenty-third street, and to the parents of such students, I have no doubt that Lincoln School is something very definite and tangible, and I strongly suspect that this lawsuit is inspired by that affectionate regard for the place where one received one's education which Webster so movingly expressed upon the argument of the *Dartmouth College* case when he said: " It is * * * a small college and yet, there are those who love it." (4 Beveridge on Life of Marshall, p. 249, discussing *Dartmouth College* v. *Woodward*, 4 Wheat. [U. S.] 518.) But in a legal sense, Lincoln School, unlike Dartmouth College, has neither charter nor property, and is not even an invisible or intangible being, and has no existence even in contemplation of law. From all the evidence I can find it to be nothing more than convenient nomenclature for an activity by which Teachers College attempts to put into execution the necessarily elastic ideas which General Education Board had in mind in making the grants. That view is impelled, not only by the language of the grants and the circumstances under which they were made, but, also, by the consideration that, if something more than a committal of the ideas to the discretion of Teachers College had been intended, the grants would have been made, not to Teachers College, but to a separate entity created for the purpose of receiving the grants. The purpose expressed in the grants thus is the execution of the ideas which General Education Board had in mind in making them.

What, then, are the ideas which General Education Board had in mind in making the grants? Certain it is that that Board was not interested primarily, if at all, in establishing just another private school in which a few hundred children who could afford some tuition could receive education at a price less than the cost of giving it. It was interested in furthering the cause of elementary and secondary education in general. The words of the grants which illuminate their purpose and intent thus are, not the words " the support of The Lincoln School of Teachers College," but the words " in order to insure the permanence of experimental work in the field of elementary and secondary education." The content and connotation of those words find illustration, but not limitation, in the formal application of October 13, 1925, the

letter of Dean Russell of April 30, 1925, and the papers of President Eliot and Dr. Flexner. Immediate but unformulated changes in existing courses of study and methods of teaching were recognized as necessary, and the running of a school was recognized as an appropriate method of finding out what the changes should be; but men who had lived to see long-used material and methods become obsolete, and to realize the necessity for permanent experimentation with new material and new methods, certainly never intended to cast into unbreakable form the pattern which the experimentation should follow. Experimentation was their purpose; Lincoln School, as known to its students past and present, was a mere incident or means. It would indeed be a paradox if men embarking upon a course of experimentation in methods and materials for education had prevented experimentation in the methods and materials by which the course of experimentation was to be carried on. I cannot attribute such a paradox to either the donor or the donee of these grants.

The purpose thus being "permanence of experimental work in the field of elementary and secondary education," the next question is whether or not such work will go on under the merger of the Horace Mann and Lincoln Schools provided for in the resolution which the trustees of Teachers College have adopted. The trustees, by their resolution, solemnly assert that it will, and there is an abundance of evidence that they acted, not arbitrarily or hastily, but after full and complete investigation and after giving heed to elaborate reports and arguments pressed upon them by persons opposed to as well as by persons in favor of the act they finally took. Such action by men who give time and energy to the task of directing the affairs of a charitable corporation bears no resemblance to acts of a private trustee in dealing with himself personally with respect to funds of his trust. By all standards by which evidence is weighed the resolution in this case affords a strong presumption in favor of its own declarations. Nevertheless, I here lay any such presumption aside. The evidence wholly extrinsic to the resolution convinces me that, to state it at its lowest, experimental work in the field of elementary and secondary education will not be halted nor its vigor or pace lessened by the adoption of the plan which the trustees have voted to adopt.

The contention to the contrary has revolved, largely if not wholly, around the assertion that Lincoln School is and always has been "an experimental school," whereas Horace Mann School is and always has been "a demonstration school." To understand those terms it is necessary to bear in mind that they are used, not in respect of the relation of the schools to the pupils therein,

but as expressive of the relation which the schools bear to Teachers College itself. Both schools are supposed to function (and the only justification for their operation by Teachers College is the supposition that they do function) as means by which Teachers College trains its own students — the persons who come to it to learn how to go out and teach elementary and secondary grades in other schools. That children are taught therein is substantially a by-product (an incident of the function of training students of Teachers College) save for the qualification that children must be well taught therein because the students of Teachers College are not well trained in teaching unless they learn how children are well taught. Lincoln School is said to aid in training students of Teachers College by affording to them and to the faculty of Teachers College an opportunity for the practical testing out of new ideas in curricula and methods; and it is not denied that it does so. Horace Mann School is said to do the distinct and different thing of aiding in training students of Teachers College by enabling such students to observe and practice the technique of using courses and methods which have been tested out and found to be worthy of adoption; and while there is an abundance of evidence that that repeatedly has been declared to be precisely what Horace Mann School has been doing for many years, it is strenuously denied that that has been or is or is to be its sole method or work or function. Upon that point I find that, despite the repeated references to Horace Mann School as " a demonstration school," it also has been testing out new ideas in curricula and methods, or, in other words, has been engaged in " experimental work in the field of elementary and secondary education."

It also may be remarked parenthetically that Horace Mann School was born of a revolt against curricula and methods existing at the time it was founded, just as Lincoln School was born of a like revolt years later, and if it were true that Horace Mann School has outlived the fire of its youth, and settled down to a smug and complacent old age, that would be a circumstance going far toward showing that there is at least a danger that Lincoln School may be about to do the same thing and that unsettling changes are essential from time to time if the idea of " permanence of experimental work in the field of elementary and secondary education " is to be carried out. Decadence seems inevitable and, therefore, renaissance is necessary. It even may be that the agitations incident to this lawsuit will serve toward an advantageous quickening of thought.

If it be assumed, however, that Horace Mann School has been and is purely and simply " a demonstration school," there still is

no evidence which persuades me that experimental work cannot or will not be carried on in the school which will result from the contemplated merger. Experts have expressed opinion both ways. I find in favor of those who say that it can and will. Even those who assert the contrary nevertheless admit that the difference between " an experimental school " and " a demonstration school " is one of emphasis or spirit or tone, and that emphasis or spirit or tone depends upon those in charge of the school. They state no reason understandable by me why different teachers teaching different classes in different grades in different classrooms must needs abandon experimentation because the common head to whom all are responsible decides to call the aggregate of all by a hyphenated name instead of by two separate names. Furthermore, no court of law or equity can dictate to the trustees of Teachers College whom they shall place in charge, in order to get a certain emphasis or spirit or tone, and could not enforce the ultimate purpose of such dictation even if it undertook to make a decree. Emphasis, spirit and tone in the conduct of a school are not proper subjects for decrees of either injunction or specific performance.

Plaintiffs argue that the action of the trustees in deciding upon the merger was dictated by financial rather than educational considerations. They point to the fact that for some years the Horace Mann School has not carried itself, i. e., the income from tuition fees paid by the students therein has not equaled the cost of running the school, and that Teachers College itself likewise is running at a loss and gradually accumulating large deficits, i. e., the income from all its funds other than the endowment received from General Education Board does not equal what Teachers College annually is spending upon what are referred to as its " general " charitable purposes. Upon that basis plaintiffs urge that what is now proposed is a diversion of the income of that endowment. Premises granted, the conclusion does not follow. The fallacy lies in the assumption that the grants were to " operate " or to " carry on " Lincoln School. That, as I already have held, is not the purpose stated in the grants.

Still further, the trustees find that the decrease in tuition fees resulting from the decrease in the number of pupils in both Horace Mann School and Lincoln School in recent years, together with the decrease in income from securities which has also taken place in recent years, has brought about a situation in which the total income of Teachers College is now so largely consumed in the actual running of the schools that little or nothing is left for experimental work which they recognize as desirable. To the extent, therefore, that financial considerations have guided the trustees,

it appears that they have been guided in the direction of preserving and furthering the work of experimentation.

Another contention urged by plaintiffs is that there heretofore has been an unlawful diversion of income because a part thereof has been used in research and experiments " outside " of Lincoln School. That again is but a reiteration of the idea that the grants were grants to and for Lincoln School, whereas I have held that the grants were and are for " experimental work in the field of elementary and secondary education " with Lincoln School as a mere name for one particular method of carrying on such experimental work.

Having reached these conclusions from a consideration of the grants as made, it is unnecessary to consider the validity or effect of the statements of policy made by General Education Board in 1934 and 1937. Whether or not an existing and competent donor who has made a gift for a specified charitable purpose may thereafter authorize the donee to use the donated property for a different charitable purpose is a question consequently unnecessary now to decide, and I do not now express an opinion upon it and do not even discuss it, except to comment that *St. Joseph's Hospital* v. *Bennett* (*supra*) does not decide it because the gift there had been made by will and there hence was no existing donor who could give such authority.

So, too, I express no opinion upon the question whether the cancellation of the 1922 agreement, specifying the conditions upon which Teachers College holds the land and buildings therein referred to, leaves Teachers College with an unrestricted title or a title subject to use for the purpose expressed in the grant in which the cancellation clause appears. The resolution of November, 1940, which is now before the court gives no indication of any present intent to use such land and buildings for any purpose other than that expressed in such grant, and decision of that question also is hence unnecessary.

In so far as the complaint seeks an injunction against carrying out the resolution of November 4, 1940, it is dismissed. If, with this denial of the injunction, any further declaration of rights or obligations is deemed necessary or proper, consideration will be given to requests therefor upon the settlement of the judgment to be entered upon this decision. Under the circumstances, no costs are awarded. Settle judgment upon notice.